UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANNA MULRYAN,                                    )
                                                 )
                        *Plaintiff*,             )
                                                 )
            v.                                   )        No. 1:19-cv-05018-JMS-MG
                                                 )
RICS SOFTWARE, INC.,                             )
                                                 )
                        *Defendant*.             )

## ORDER

Plaintiff Anna Mulryan began working as a Support Consultant for Defendant RICS Software, Inc. ("RICS") in 2014.  In 2018, she became ill and was ultimately diagnosed with health issues which led to a tracheotomy.  When she returned to work, her doctor restricted her to speaking for a total of 30 minutes out of the eight-hour work day.  Her doctor later permitted her to speak for four hours out of the eight-hour work day, but RICS ultimately terminated her employment, claiming that she was not able to perform an essential function of her job due to the speaking restriction.  Ms. Mulryan initiated this lawsuit on December 23, 2019, and asserts claims against RICS for discrimination and retaliation under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA").  [Filing No. 1.]  RICS has filed a Motion for Summary Judgment, [Filing No. 44], which is now ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether

1

a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.    RICS's Business

RICS is an Indianapolis-based software company which provides point-of-sale and business performance software for retail stores. [Filing No. 44-11 at 22.][1] RICS's clients include shoe retailers, clothing and jewelry boutiques, seasonal Halloween stores, and running retailers.

---

[1] The Court's Practices and Procedures provide that "[i]n a supporting brief, [a party must] cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document," and provides an example of the proper citation form. [Filing No. 6 at 4.] Ms. Mulryan does not follow this citation form, instead including the name of the document and not the docket number. [*See, e.g.*, Filing No. 52 at 3 (citing to "Affidavit of Anna Mulryan 'Mulryan Aff.' ¶ 4; a true and accurate copy of this Affidavit is attached to Plaintiff's Designation of Evidence as Exhibit A," instead of "Filing No. 51-1" – the docket number of Ms. Mulryan's Affidavit).] Ms. Mulryan's failure to follow the Court's Practices and Procedures has made the Court's review of the pending motion unnecessarily cumbersome. The Practices and Procedures have been in effect for several years, and Ms. Mulryan's counsel is an experienced and frequent litigator in this Court. The Court expects full compliance with its Practices and Procedures in this and other litigation going forward.

[Filing No. 44-11 at 22-23; Filing No. 44-12 at 41.]  RICS generally employs between 25 and 30 employees.  [Filing No. 44-13 at 44.]

As part of its services, RICS provides technical supports for its products to its clients, including initial client onboarding and ongoing customer support.  [Filing No. 44-1; Filing No. 44-11 at 22; Filing No. 44-14 at 26; Filing No. 44-14 at 87-88.]  The level of service that RICS provides to its customers "is a very big selling point, the amount of time that they're available, the level of help they can expect to receive."  [Filing No. 44-14 at 87-88.]  RICS also strives to "[t]reat every customer as if they're your biggest, best client that you have, whether it's a small company that has one or two stores, or a [larger customer] that has hundreds of stores."  [Filing No. 44-11 at 42.]  Customer service is the "lifeblood" of RICS, it "keep[s] [the] organization running smoothly," and RICS works hard to "maintain this high level of service that [its] customers have come to expect."  [Filing No. 44-14 at 88.]

### B.    The Support Consultant Position

RICS employs between five and six Support Consultants, who provide technical support to all RICS clients.  [Filing No. 44-1; Filing No. 44-11 at 19; Filing No. 44-14 at 26.]  Support Consultants resolve client inquiries by providing "positive, clear, succinct, and high-quality inquiry resolutions," and "[p]erform[ing] root cause analysis" of problems.  [Filing No. 44-1.]  Support Consultants are the "first line of defense" for RICS's customer service efforts, and are "the highest touch point of anybody in the company as it relates to interacting with…customers."  [Filing No. 44-14 at 87.]

Support Consultants "answer[] phone calls [and] help[] the clients resolve whatever issues they may have had."  [Filing No. 44-11 at 20.]  Aside from receiving telephone calls from clients, Support Consultants also receive emails from clients and have to respond back either via telephone

4

or email.  [Filing No. 44-11 at 20.]  Most Support Consultants work between 9:00 a.m. and 6:00

p.m., and one Support Consultant works a late shift from 12:00 p.m. to 9:00 p.m. so  that overall

daily client coverage is from 9:00 a.m. to 9:00 p.m.  [Filing No. 44-1; Filing No. 44-11 at 15;

Filing No. 44-14 at 33-34.]  Additionally, one Support Consultant works "on call" over the

weekend, from 9:00 a.m. to 9:00 p.m. on Saturdays and Sundays.  [Filing No. 44-11 at 16-17;

Filing No. 44-14 at 36.]  Support Consultants handled the "on call" weekend shifts by rotating –

the first Support Consultant would take the first weekend shift, the second Support Consultant

would take the next weekend, and so on until everyone had covered a weekend shift – and then

the rotation would begin again.  [Filing No. 44-14 at 35.]  The late shift during the weekend was

covered using a similar rotation.  [Filing No. 44-14 at 82-83.]

Support Consultants provide technical support via telephone, chat, email, and web inquiry.

[Filing No. 44-11 at 20; Filing No. 44-14 at 12.]  Each inquiry results in the creation of a "ticket"

that the Support Consultant needs to resolve.  [Filing No. 44-11 at 22.]  Telephone calls are the

primary method of communication between Support Consultants and clients, and are expected to

be the "focus" for Support Consultants.  [Filing No. 44-14 at 19-20.]  If a Support Consultant is

not working on resolving a ticket and they receive a call, they are expected to answer the call.

[Filing No. 44-14 at 19-20.]  In 2018, 45.5% of all tickets generated were initiated by telephone

calls.  [Filing No. 44-11 at 39; Filing No. 44-14 at 46.]  Additionally, it is a "fairly regular

occurrence" that tickets initiated through email, chat, or web inquiry "transition from a written

form of communication to a phone call based on the need of the client."  [Filing No. 44-11 at 39;

Filing No. 44-14 at 41; Filing No. 44-14 at 60-61.]  Some clients prefer to communicate via

telephone, so "even in a ticket that [was not] initiated with a phone call, they try to get you to call

them in some circumstances."  [Filing No. 44-12 at 36-37.]  Support Consultants would also

sometimes receive correspondence in which the client requested that they be contacted via telephone, and some clients just "want to be walked through" a solution on the telephone. [Filing No. 44-12 at 37-38.]

If a question was "more complicated or more specific to their organization," the Support Consultant might be "more likely to respond to a chat with a phone call to give a complex answer." [Filing No. 44-12 at 37-38.]   Customer calls also increased with "new functionality" in the software, or during various business seasons such as back-to-school, Halloween, inventory season, or running season. [Filing No. 44-12 at 39-41.] RICS adds 60 to 80 stores to its client base every Halloween season, and the new stores frequently have service phone calls lasting "from 30 minutes to an hour." [Filing No. 44-14 at 66-67.] Starting the Fall of 2017, the Halloween stores set up appointments which were spread out amongst the Support  Consultants to have a phone call to set up their systems. [Filing No. 51-1 at 3.]

Support Consultants answer telephone calls in a "rolling queue," and when a call comes in, the phone "ring[s] to an individual consultant's line.  If they don't answer after a certain period, it [would] ring to the next person, and continue through everyone listed in the queue." [Filing No. 44-14 at 14-15.] If a Support Consultant does not answer the phone, the caller is given the option to leave a voicemail message. [Filing No. 44-14 at 15.] Tickets generated from chats, emails, or the web, however, are "just grabbed from…[a] ticket queue by whoever is ready to take something." [Filing No. 44-14 at 15.]

Calls from customers vary in length, and can last anywhere from a few seconds to several hours. [Filing No. 44-12 at 27; Filing No. 44-15 at 9.]  It is "very easy for a call to [last] an hour plus, maybe more," or "to string a few of those types of calls together in a day." [Filing No. 44-

14 at 73-75.]  Support Consultants often spend a "majority of their day on the phone in some capacity."  [Filing No. 44-14 at 73.]

The volume of telephone calls varies, and no one knows "exactly what [Support Consultants are] going to get on any given day."  [Filing No. 44-14 at 66-69.]  Call volume could increase based on the season, or in an emergent situation such as when a server went down, resulting in "an alarming rate of phone calls [and] emails in at one time because…the software [was] not working."  [Filing No. 44-11 at 35; Filing No. 44-14 at 37.]  RICS relies upon "all [its] resources on the team to be able to operate at full capacity in the [Support Consultant] role," including the ability to speak.  [Filing No. 44-14 at 67.]

### C.     Ms. Mulryan's Initial Work As a Support Consultant

Ms. Mulryan was hired as a Product Consultant at RICS in 2014.  [Filing No. 44-11 at 9.] The title of Product Consultant later became Support Consultant, and Ms. Mulryan's title was changed to Support Consultant but her position remained the same.  [Filing No. 44-11 at 9; Filing No. 44-14 at 12.]  Ms. Mulryan had the same duties as a Support Consultant throughout her employment with RICS.  [Filing No. 44-11 at 9; Filing No. 44-14 at 12.]  When she was hired, Ms. Mulryan was given access to the RICS Software Employee Handbook (the "Handbook") and policies.  [Filing No. 44-2; Filing No. 44-3; Filing No. 44-11 at 44-46.]  RICS's policies included leaves of absence for medical issues, and leave under the Family and Medical Leave Act ("FMLA").  [Filing No. 44-2 at 3-7.]

Before her illness, Ms. Mulryan spent approximately three hours of her eight-hour shift talking on the phone with clients.  [Filing No. 51-1 at 2.]  The only exception to this was when RICS's software would have functionality issues, inquiries via telephone, email, and web would greatly increase for a short time until a genal notice regarding the issue was sent to RICS's clients.

[Filing No. 51-1 at 2.]  These increases generally lasted an hour or two.  [Filing No. 51-1 at 2.]  In 2017 and the first two months of 2018, Ms. Mulryan spent more than four hours on the phone with customers in one workday approximately once every two months.  [Filing No. 51-1 at 2.]  If a client called with a complex issue, Ms. Mulryan would get the necessary information from the client to address the problem and then ask them if she could call them back once she had figured out how to resolve the issue.  [Filing No. 51-1 at 3.]  Before her illness, Ms. Mulryan also used Skype or Instant Message to ask questions to other Support Consultants.  [Filing No. 51-1 at 3.]

### D.   Ms. Mulryan's Health Issues

In early March of 2018, Ms. Mulryan became ill while working a weekend shift.  [Filing No. 44-11 at 47-48.]  Ms. Mulryan notified RICS's Client Success Director and her supervisor, Jimmy Richburg, to let them know that she was going to MedCheck to be seen by a doctor.  [Filing No. 44-11 at 47-48.]  Shortly thereafter, Ms. Mulryan was taken to the emergency room and admitted to the hospital.  [Filing No. 44-11 at 47-48.]  Ms. Mulryan notified Mr. Richburg that she was being admitted to the hospital, and does not remember anything until two weeks later.  [Filing No. 44-11 at 55-56.]  After she woke up, Ms. Mulryan's father told her that a RICS representative had told him that Ms. Mulryan did not need to worry about her job, and that she should work on getting better.  [Filing No. 44-11 at 58.]

Ms. Mulryan was ultimately diagnosed with "rheumatoid," or some type of rheumatic condition.  [Filing No. 44-11 at 48.]  She spent two and one-half months total either in the hospital or a rehabilitation facility.  [Filing No. 44-11 at 48-49; Filing No. 44-11 at 59.]  Ms. Mulryan also underwent a surgery related to her treatment, and was sedated, placed on a ventilator, and had a tracheotomy performed.  [Filing No. 44-11 at 51-52.]

On May 9, 2018, Ms. Mulryan was discharged from the hospital.  [Filing No. 44-11 at 59.] She was not ready to return to work at that point, and needed to be supervised at home – primarily by her father, who was a licensed Emergency Medical Technician.  [Filing No. 44-11 at 60.]  When she arrived home, she still had the tracheotomy in, was on oxygen, and had to be monitored for a fever and other symptoms.  [Filing No. 44-11 at 60-61.]

### E.    RICS Grants Ms. Mulryan's Request for Medical Leave

While she was in the hospital, Ms. Mulryan's father kept in touch with Mark Brown, RICS's Chief Financial Officer, the entire time.  [Filing No. 44-11 at 53-56.]  Ms. Mulryan did not directly communicate with Mr. Brown, Mr. Richburg, or anyone at RICS during her hospitalization, and her father handled everything.  [Filing No. 44-11 at 60.]  Beginning with her initial hospitalization, Mr. Brown made sure that RICS provided Ms. Mulryan with leave under its FMLA policy.  [Filing No. 44-13 at 44-45.]  When her FMLA leave expired, RICS continued to provide leave to Ms. Mulryan and she "continued to accrue paid time off throughout the time that she was unable to work."  [Filing No. 44-13 at 28-29; Filing No. 44-13 at 45.]

### F.    The Effect of Ms. Mulryan's Leave on RICS's Customer Service Performance

By May 2018, two months after Ms. Mulryan initially became ill, Mr. Richburg began receiving complaints from his support team that the Support Consultants "were feeling overworked," due to the absence of "an additional resource."  [Filing No. 44-14 at 58-59.]  The complaints were not about Ms. Mulryan or her need for leave.  [Filing No. 44-12 at 48-49; Filing No. 44-14 at 58.]  The lack of an additional Support Consultant at RICS meant "fewer people able to take [phone] calls," and the other Support Consultants taking calls more frequently.  [Filing No. 44-14 at 61-62.]  The Support Consultants were reporting that they were spending more time on the phone "without really getting a chance to take a break between calls and compose themselves,"

which lead to a "fairly obvious" "decrease in call quality" and "quality of their conversations." [Filing No. 44-14 at 61-62.]

Mr. Richburg observed a decrease in performance after Support Consultants were "on the phone for an extended period of time." [Filing No. 44-14 at 63.] Support Consultant Bryan Phillips always brought up this issue with Mr. Richburg "during [their]…[monthly] individual one-on-one meetings," and believed that the lack of an additional Support Consultant put "more pressure on every support worker because we were down a person" resulting in an "increase in tickets solved and customer inquiries." [Filing No. 44-15 at 11.] Support Consultant David Rose, who first became a Product Consultant in 2013 or 2014 and was a co-worker of Ms. Mulryan's during her entire time at RICS, also remembered talking about the issue with Mr. Richburg at monthly one-on-one meetings, and he believed that they "just had less people to handle the incoming inquiries in the scheduled hours for the support team, so it made [his] job harder by adding more work…." [Filing No. 44-12 at 15; Filing No. 44-12 at 32-33.] Mr. Rose worried about the increased workload, and that the lack of another person "increased the times that [each Support Consultant] had to work the weekend and late shift[s]." [Filing No. 44-12 at 32-33.]

### G.   RICS Asks Ms. Mulryan to Return to Work With Accommodations

On June 27, 2018, Mr. Brown emailed Ms. Mulryan, stating:

As we discussed earlier today with my phone call, see below.

This message is to give you a choice of returning to work or terminating employment with RICS Software, Inc.

The RICS Service function needs another full-time employee in the role of Support Associate to back-fill your vacancy.  We need you to return to your previous position and perform the job functions you were performing at the level of performance you did prior to becoming disabled.  Our request is that you return to work on July 9, 2018 at 9:00 AM in our office….

> If you are unable or unwilling to return to work, your employment with RICS Software Inc. will terminate on that date.  If employment is terminated, you will be eligible for rehire consideration pending position availability and staffing needs at that time.
>
> Please follow-up with me by end of day 6/29/18 at 5:00 PM with your decision and you can reach me any time between now and then.

[Filing No. 44-4 at 2.]

Ms. Mulryan responded to Mr. Brown via email the following day, asking if they could discuss the matter in person and stating "[a]s we have previously discussed, I have always intended to return to work but there are medical restrictions that I need to follow per my doctors." [Filing No. 44-4 at 1.]  Thereafter, Ms. Mulryan met with Mr. Brown and Mr. Richburg[2] at RICS's downtown Indianapolis office to discuss Ms. Mulryan's return to work.  [Filing No. 44-11 at 64.] Mr. Brown and Mr. Richburg stated that they wanted Ms. Mulryan to come back to work, but Ms. Mulryan did not bring or provide any documentation detailing when she would be able to return to work.  [Filing No. 44-11 at 67.]  Ms. Mulryan did explain that her doctor did not clear her to return to work until July 31, 2018, and that, when she did return to work, she would likely be subject to some restrictions on her speaking ability.  [Filing No. 44-11 at 67; Filing No. 44-13 at 45-46.]  Her request for a vocal accommodation was because it hurt her to speak, and because she "still had the trach[e] in at that time." [Filing No. 44-11 at 75.]  Ms. Mulryan did not specify what the restriction would be, because "she hadn't yet met with her physician to discuss the return to work, what the restriction would be, and certainly how long the restriction would last." [Filing

---

[2] RICS states that Ms. Mulryan met with Mr. Brown and Mr. Richburg on July 6, 2018, but cites to Ms. Mulryan's deposition testimony, in which she states that the meeting was with "Mr. Becker and Mr. Brown." [Filing No. 45 at 11 (citing Filing No. 44-11 at 64).]  Because there is no mention of Mr. Becker in any of the parties' filings, and since Ms. Mulryan does not dispute that the meeting was with Mr. Brown and Mr. Richburg, the Court assumes that the reference to Mr. Becker in the deposition transcript is in error.  In any event, whether it was Mr. Richburg or Mr. Becker at the meeting is irrelevant to the disposition of the pending motion.

No. 44-13 at 46.]    Mr. Brown told Ms. Mulryan that RICS would be willing to try the accommodation during a "trial period," but Ms. Mulryan's request was "undefined."  [Filing No. 44-13 at 46.]

On July 9, 2018, Mr. Brown sent an email to Ms. Mulryan stating:

Thank you for coming in to the office to communicate your current status.

Jimmy, Roy and I were able to meet this morning to discuss your request to hold the position at RICS until your next scheduled appointment on July 31st, and August 1st.  Here is our revised expectation of your return to work schedule.

• We will hold your current position until August 2, 2018 you will come to work on the 2nd and 3rd.

• Expectation is that you will be scheduled for a normal 40 hour work week in the office beginning week of August 6th.

• The position continues to be performed from our office at 129 E Market Street.

• We will assign you work that entails only occasional voice requirements. We will evaluate on August 31st the status of your ability to use your voice and our business requirements.

Please reply by this Friday 7/14/2018 with your agreement to the above expectations.

We are looking forward to your continued recovery and re-boarding to the RICS organization.

[Filing No. 44-5 at 8.]

The next day, Ms. Mulryan responded to Mr. Brown stating in an email:

Everything looks good, but I do have a couple of questions before we green light everything.

- Would it be ok to have my first day back in the office August 6th?  I have another doctors appointment on August 2nd which is a long appointment because they are doing tests and blood work.

- For my future doctors appointments that I have scheduled for the year can I put in for PTO on those days or should I talk that over with Jimmy first?

12

- For the reevaluation on August 31st is this for job performance, just voice ability at that point, or both?

- I know that in the new office we are not supposed to eat at our desks and just in the eating area on the 10th floor. Is it ok for me to have snacks at my desk for when I take my medicine throughout the day?

I also just wanted to let you guys know that I might have to bring a piece of equipment and supplies with me to work for my trache. The supplies are for cleaning that I have to do through out the day and the equipment piece is a suction machine in case I need to clear out the trache if something was to be clogged. I'm awaiting to hear back from my doctor to see if I'll need to bring that with me or not, but I wanted to let you guys know ahead of time of that possibility, and I forgot to mention it when I was down last Friday.

[Filing No. 44-5 at 7.]

On July 13, 2018, Mr. Brown responded to Ms. Mulryan via email:

Yes the 6th is fine.

PTO is expected for Dr. Appointments. If it is possible for you to make a certain day of the month/week set aside for all Dr. appointments we would be open to making sure we have that day off scheduled for you, just a thought.

Reevaluation is for both, how is it working out in total.

Keep the desk clean and a snack is fine….

Keep us posted about the need for equipment. We may wish to alter the plan depending on the answer you get from your Dr.

Have a great weekend.

[Filing No. 44-5 at 5-6.]

Ms. Mulryan responded later that day to Mr. Brown, writing:

Great! Thank you! I will see about moving around appointments if there are opening[s] to get them on the same day and see if that works out better. As soon as I hear back from my doctor on equipment I will let you know. Unless anything changes, I will see you guys in the office on August 6th at 9:00 a.m.

[Filing No. 44-5 at 5.] She emailed Mr. Brown again on July 17, 2018, stating:

My doctor said that I need to bring my machine with me along with supplies in case something were to go wrong at work.  He said it's better to have it with me and not need it than to not have it and need it for some reason.  It is a portable machine with a carrying case so I can bring it into the office with me.  Also I go to see my lung doctor on August 22nd so I should have a better idea at that point as to when the trache will be coming out if it doesn't come out on that day.  Please let me know if you have any questions.

[Filing No. 44-5 at 4.]

### H.     Ms. Mulryan Returns to Work With Restrictions

On August 6, 2018, Ms. Mulryan returned to work.  [Filing No. 44-11 at 82.]  Upon her return, she handed Mr. Brown a Return to Work Certification, verifying her return and providing more details about her voice restriction.  [Filing No. 44-6; Filing No. 44-11 at 80-82.]  The Return to Work Certification, completed by Ms. Mulryan's doctor, stated that Ms. Mulryan could return to work with restrictions, and that "Patient unable to speak greater than 30 minutes in one shift. Recommend data entry and jobs requiring no talking."   [Filing No. 44-6 at 1.]  The Return to Work Certification also stated that the restriction was to remain in place until December 1, 2018. [Filing No. 44-6; Filing No. 44-11 at 81.]   Based on the restriction in the Return to Work Certification, Ms. Mulryan could not speak more than 30 cumulative minutes during an 8-hour shift.  [Filing No. 44-11 at 83.]  For example, if she had a 10-minute phone call followed by a 20-minute phone call, she would not be allowed to speak for the rest of her shift.  [Filing No. 44-11 at 83-84.]   As a result, Mr. Richburg asked Ms. Mulryan to focus on other methods of communication, such as email or chat tickets, during the trial period.  [Filing No. 44-11 at 84; Filing No. 44-14 at 41.]  She communicated with other Support Consultants during this time using Skype to message them.  [Filing No. 44-11 at 85-86.]  Ms. Mulryan would only take a telephone call during this time when all other Support Consultants were on the phone with customers.  [Filing No. 44-11 at 89.]

14

When she returned, the other Support Consultants welcomed Ms. Mulryan back and Ms. Mulryan responded with a smile or nod but would not necessarily have a conversation. [Filing No. 44-11 at 86-87.] During the trial period, Ms. Mulryan kept track of the calls that she took to help monitor the amount of time that she was spending on the phone. [Filing No. 44-11 at 84.] She did not formally log any time because, since she was focusing on chat and email tickets, she really was not speaking at all. [Filing No. 44-11 at 87.] She generally discarded her notes reflecting the amount of time that she spent on the phone at the end of each day. [Filing No. 44-11 at 90.]

There were five Support Consultants working at RICS while Ms. Mulryan was on medical leave, and when Ms. Mulryan returned to work in August 2018 there were only five Support Consultants including her. [Filing No. 44-11 at 87-88; Filing No. 51-3.] During August 2018, the Support Consultants at RICS completed the following percentage of the solved tickets: (1) Mr. Ford – 23.4%; (2) Mr. Rose – 22.8%; (3) Mr. Phillips – 20.1%; (4) Ms. Mulryan – 18.5%; and (5) Adam Forkner – 15.2%. [Filing No. 51-3.] Mr. Richburg does not recall an issue with client tickets not being resolved in August 2018, nor does he recall any "client complaints about less than satisfactory telephone service in August of 2018." [Filing No. 44-14 at 58; Filing No. 44-14 at 62-63.] Mr. Richburg testified that on average in 2018, a Support Consultant would spend a "majority of their day on the phone in some capacity" or "at least 50 percent," and that as of September 11, 2018 – the date of Ms. Mulryan's eventual termination – RICS did not "know how much time its support consultants were spending on the phone on average each day they worked." [Filing No. 44-14 at 73-76.]

In August 2018, 42.9% of all tickets were initiated by telephone, 21.3% of all tickets were initiated by chat, 31.1% of all tickets were initiated by email, and 4.8% of all tickets were initiated

by web.  [Filing No. 51-2 at 4-5; Filing No. 51-2 at 9.]  During that month, Ms. Mulryan was the first or second highest Support Consultant at closing tickets.  [Filing No. 51-2 at 4-5.] Additionally, in August 2018 the Support Consultants received the following customer satisfaction scores: (1) Mr. Ford – 100%; (2) Mr. Rose – 100%; (3) Mr. Phillips – 97%; (4) Ms. Mulryan – 96%; and (5) Mr. Forkner – 73%.  [Filing No. 51-2 at 10.]

## I.     RICS's Requests That Ms. Mulryan Return With No Restrictions

At the end of her trial run, Mr. Brown and Mr. Richburg met to discuss the speaking restriction and Ms. Mulryan's employment.  [Filing No. 44-13 at 30.]  Mr. Brown asked Mr. Richburg whether having Ms. Mulryan back in "the capacity where her voice was restricted was benefiting the team enough to alleviate the need to have a full-time position with unrestricted voice usage."  [Filing No. 44-13 at 30.]  Mr. Richburg responded that he was still getting complaints from the Support Consultants that they were being overworked.  [Filing No. 44-13 at 30.]  For example, Mr. Phillips had told Mr. Richburg that Mr. Mulryan's return did not "really [have] a big impact because she was limited on how much she could handle as far as…telephone calls."  [Filing No. 44-15 at 11-12.]  Additionally, Mr. Rose complained that his workload in terms of late night and weekend coverage was not better even with Ms. Mulryan handling chat and email tickets. [Filing No. 44-12 at 48-49.]

With fewer Support Consultants to take calls, the remaining consultants were required to take calls more frequently, leading to a decrease in the quality of calls.  [Filing No. 44-14 at 61-62.]  This was exacerbated by the fact that Support Consultants were still working extra weekend and late shift rotations.  [Filing No. 44-12 at 48-49.]  The "service aspect of [RICS's] business is incredibly important," and RICS needed the Support Consultants "to be able to perform at a high

quality at all times…."  [Filing No. 44-14 at 62.]  One customer having a bad experience could "very easily reverberate across…a large section of [the] customer base."  [Filing No. 44-14 at 62.]

It was also important for Support Consultants to communicate frequently with one another by voice regarding recurring issues, ticket notes, and similar matters.  [Filing No. 44-11 at 30-31; Filing No. 44-14 at 60-61.]  Additionally, the situation was complicated by the fact that RICS was headed into one of its busiest seasons.  [Filing No. 44-14 at 66-67.]

### J.  RICS's Requests That Ms. Mulryan Get a Full Release From Her Vocal Restriction

Mr. Brown and Mr. Richburg concluded that Ms. Mulryan could not perform the essential functions of the Support  Consultant position, and believed that they needed a Support Consultant that could work full-time without a vocal restriction.  [Filing No. 44-13 at 31; Filing No. 44-14 at 60-61; Filing No. 44-14 at 66.]  They believed that, even though they had just hired a new full-time Support Consultant, they still needed Ms. Mulryan back as a full-time resource.  [Filing No. 44-14 at 68-69.]

On September 4, 2018, Mr. Richburg and Mr. Brown met with Ms. Mulryan regarding her speaking restriction.  [Filing No. 44-11 at 94-95.]  They told her during the meeting that they needed a Support Consultant without any restrictions, and asked Ms. Mulryan to see if she could get an opinion from her doctor removing all medical restrictions.  [Filing No. 44-5 at 3-4; Filing No. 44-11 at 95.]  After the meeting, Mr. Brown sent Ms. Mulryan the following email message:

> Below is a recap of our conversation this afternoon.
>
> On July 9th in an email…we committed to trial an accommodation regarding a restriction on your voice, we agreed to reevaluate the effectiveness after August 31, 2018 to determine if business requirements were being satisfied.  You, Jimmy Richburg and I met today to communicate our evaluation of the effectiveness of the current restricted work arrangement and accommodations that have been temporarily made.  During this meeting it was communicated that the voice

restrictions imposed by your doctor which only allow 30 minutes of voice usage per shift are not meeting our business requirements.  Below are two options:

1) If your condition has changed and you can get a work release from a doctor to grant you full use of your voice by Friday September 7, 2018, we will resume your normal job functions and expectations effective immediately, including unlimited use of your voice during your work shift.

2) If you cannot obtain a release to grant you full use of your voice by Friday September 7th we will be terminating our employment relationship, effective September 7, 2018.  If you are unable to work you can contact Principal to have your Long-term disability claim reexamined for coverage….

You will remain on paid leave until Friday September 7, 2018.

[Filing No. 44-5 at 3-4.]

Later that same day, Ms. Mulryan responded to Mr. Brown, stating:

I called my doctor's office and my doctor is out of town until next week.  I scheduled an appointment for Tuesday at 1:45 pm which was his 1st available appointment time and that's the day I will be back in town.  I've provided my doctor's name and phone number if you need to call there….

Since this is out of my control where do we go from here?  Is it ok that I get you the release form on Tuesday September 11th?  Also do you need him to fill out that form again?  And do I need to come into the office on Tuesday September 11th since that is the first day I'm back from PTO?

Please let me know.

[Filing No. 44-5 at 3.]  Mr. Brown responded:

We will extend the timeframe from September 7, 2018 to Tuesday September 11, 2018, as you have requested.  Yes, we require an updated form from the Dr. that releases you to work without restrictions.

If you are released without restrictions you should come to work on Wednesday.

If there are restrictions we will terminate employment as of September 11, 2018.  You will be eligible for rehire but a position will not be held open for you.

[Filing No. 44-5 at 3.]

### K.     RICS Terminates Ms. Mulryan

On September 11, 2018, Ms. Mulryan emailed Mr. Brown stating:

I have attached the form to this email.  My doctor still has me on restriction to 4 hours a day until 11/17/18.  He said that he wants to make sure everything is completely healed and strong enough to take on a full 8 hour day.  He said if I feel good before then that I can come see him again and he will fill out another form lifting the restriction but he said I need to see how I do on these hours first.

Can we work with this?  As I've stated numerous times I want to keep my job so I'm hoping we can work this out.  Please let me know so that I know to come into work tomorrow.

[Filing No. 44-5 at 1-2.]

The Return to Work Certification that Ms. Mulryan attached to her email stated "Limited vocal activity including less than 4 hours of phone per day," and was effective from September 17, 2018 to November 17, 2018.  [Filing No. 44-8.]  Ms. Mulryan believes that the September 17, 2018 return-to-work date is a clerical error based on her conversations with her doctor, and that she was actually cleared to return on September 11, 2018.  [Filing No. 44-5 at 1-2; Filing No. 51-2 at 6-7.]

Even with the revised vocal restriction, Mr. Brown and Mr. Richburg believed that the ability to speak on the phone during an entire shift, including late shifts and weekends, was an essential function of being a Support Consultant.  [Filing No. 44-13 at 37.]  Increasing Ms. Mulryan's ability to speak to four hours per shift did not alleviate their concerns.  [Filing No. 44-13 at 46-47; Filing No. 44-14 at 72-73.]  Mr. Richburg was concerned that Ms. Mulryan could not perform the essential functions of the job, given the unpredictability that a Support Consultant could face in any given shift.  [Filing No. 44-14 at 80.]  Phone calls could last over an hour, and Support Consultants could receive several of these long calls per day.  [Filing No. 44-14 at 74-75.]  Ms. Mulryan could easily exceed her four-hour limit of speaking, especially if there were a server

outage that "exponentially increases the number of inquiries coming in…through the phone." [Filing No. 44-14 at 80.]  A Support Consultant just did not "know how much time in shift will require voice," and it could "be a hundred percent [of the time] between the conversations with the client and the conversations that you have amongst other support team members to help resolve client issues."  [Filing No. 44-13 at 46-47.]  Mr. Rose, however, did not believe that Support Consultants spent more than four hours on the phone during a normal day.  [Filing No. 44-12 at 40.]  Additionally, Mr. Rose's experience was that Support Consultants working remotely during the COVID-19 pandemic used Microsoft Teams to chat about customer issues.  [Filing No. 44-12 at 25.]

Mr. Brown and Mr. Richburg discussed the four-hour restriction and determined that, without a full release from the vocal restriction, Ms. Mulryan would be terminated.  [Filing No. 44-13 at 33-34.]  Later in the day on September 11, 2018, Mr. Brown emailed Ms. Mulryan, stating:

> We are moving forward with terminating employment with RICS Software, Inc. effective today.
>
> As stated in the attached email from September 5, 2018[:]  "If there are restrictions we will terminate employment as of September 11, 2018."
>
> *                *                *
>
> You are eligible for rehire once all medical restrictions are removed, but a position will not be held open for you.

[Filing No. 44-5 at 1.]

No one at RICS told Ms. Mulryan that she was being terminated due to her disability, and she is not aware of any other statements that any action was taken against her because of her disability.  [Filing No. 44-11 at 109-10.]  She did not hear anyone at RICS discussing her disability in an inappropriate manner.  [Filing No. 44-11 at 110.]  Ms. Mulryan also was not aware of any

other open positions at RICS at the time of her termination, and all other Support Consultants working at RICS "could speak and answer the phone as part of the job without restriction." [Filing No. 44-11 at 110.]  After her termination, Ms. Mulryan never attempted to reapply for a job at RICS, and never looked to see if RICS had any open positions after her speaking restriction was removed.  [Filing No. 44-11 at 108-09.]

### L.      The Lawsuit

On December 23, 2019, Ms. Mulryan initiated this litigation against RICS and asserts claims for ADA discrimination and retaliation.  [Filing No. 1.]  In her Statement of Claims, she sets forth the following claims under the ADA: (1) disability discrimination; (2) failure to accommodate; (3) "failure to engage [in] an interactive process"; and (4) "retaliatory discharge due to disability discrimination." [Filing No. 39 at 1.]

### III.
#### DISCUSSION

In order to succeed on any of her ADA claims, Ms. Mulryan must show that she was a qualified individual under the ADA, meaning that she was able to perform the essential functions of her job.  *Vargas v. DeJoy*, 980 F.3d 1184, 1188 (7th Cir. 2020).  The Court addresses this threshold issue first.

### A.      Whether Ms. Mulryan Could Perform the Essential Functions of Her Job

In support of its Motion for Summary Judgment, RICS argues that Ms. Mulryan was not a qualified individual under the ADA because she was not able to perform an essential function of the Support Consultant job:  being able to speak on the telephone for an entire eight-hour shift. [Filing No. 45 at 19.]  RICS asserts that the evidence shows that Support Consultants "spent a significant amount of time speaking on the phone throughout their work shifts," and that "telephone was the most common method of communicating with clients." [Filing No. 45 at 21.]

It notes that Support Consultants would end up spending a majority of their day on the phone, and that the written job description for the Support Consultant position indicates that being able to speak on the phone is an essential job function. [Filing No. 45 at 21-22.] RICS points to the consequences of Ms. Mulryan not taking phone calls during her shift, including that the other Support Consultants had to take calls more frequently and that there was a resultant decrease in the quality of the service provided. [Filing No. 45 at 22.]

Ms. Mulryan responds that speaking on the phone was not an essential function of the Support Consultant job, noting that the job description does not mention this task, and that there is a question of fact regarding how much time a Support Consultant was generally required to spend on the phone. [Filing No. 52 at 18-19.] Ms. Mulryan points to evidence that she spent a limited amount of time on the phone before she became ill, that she would get information from customers regarding complex issues and then call them back, and that Support Consultants communicated with each other via chat rather than telephone. [Filing No. 52 at 19-20.]

In its reply, RICS reiterates its argument that being able to speak on the telephone for an entire eight-hour shift was an essential function of the Support Consultant position. [Filing No. 53 at 4-15.]

The essential functions of a job are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Whether a function is essential to a job is a question of fact, and the factfinder should consider "the employer's judgment, the employee's written job description, the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Conners v. Wilkie*, 984 F.3d 1255, 1261 (7th Cir. 2021) (quotation and citation omitted). The Seventh Circuit has noted that it "usually do[es] not second-

guess the employer's judgment in describing the essential requirements for the job…[b]ut this deference is not unqualified." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687-88 (7th Cir. 2020) (citing *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998)).

RICS's judgment, and specifically the judgment of Mr. Richburg and Mr. Brown, was that being able to speak for an entire eight-hour shift was an essential function of the Support Consultant job.  The written description of the Support Consultant position includes the following elements which either explicitly relate to speaking, or could relate to speaking:

Communication Skills

- Write and speak clearly

- Craft a clear and compelling argument in email, document or conversation

- Maintain productive dialogue with all my colleagues without dropping balls

- Proactively communicate with colleagues and clients….

Presentation

*       *       *

- Successfully deliver a sizable portion of a final presentation

- Successfully deliver a winning presentation without assistance

- Engage clients with a narrative that wins them over (regardless of seniority)

*       *       *

Counsel

*       *       *

- Offer meaningful off-the-cuff advisement to a colleague and client

[Filing No. 44-1.]

Both RICS's judgment and the written job description weigh in favor of the conclusion that the ability to speak for some length of time was an essential function of the Support Consultant job. However, the main dispute is the length of time a person was required to speak. If speaking was only required for half of a typical shift, then Ms. Mulryan could perform the essential functions of the Support Consultant job after her trial return to work in August 2018. If speaking was required for a full shift in order to perform the essential functions of the Support Consultant job, then there is no dispute that Ms. Mulryan could not speak for that long at the time that she was terminated. The parties have presented conflicting evidence regarding the frequency with which Support Consultants needed to be able to speak. RICS provides evidence that the ability to speak for an entire shift was an essential job function, including, for example, the following:

- Telephone calls were the primary method of communication between Support Consultants and clients, and Support Consultants were expected to focus on telephone calls, [Filing No. 44-14 at 19-20];

- Telephone calls were the most common method for initiating tickets with Support Consultants, [Filing No. 44-12 at 36-37; Filing No. 44-14 at 46];

- Nearly half of all tickets generated in 2018 were initiated by telephone, [Filing No. 44-11 at 39; Filing No. 44-14 at 46];

- Some customers' preferred method of communicating was talking on the phone, [Filing No. 44-12 at 36-37];

- Support Consultants can often spend a majority of their day on the phone in some capacity, [Filing No. 44-14 at 73];

- It is very easy for a call to last an hour or more, and it is also possible "to string a few of those types of calls together in a day," [Filing No. 44-14 at 73-75]; and

- The volume of telephone calls varied, and could increase for seasonal reasons or in an emergent situation, [Filing No. 44-11 at 35; Filing No. 44-14 at 37].

Ms. Mulryan, however, presents evidence that:

- Mr. Rose believed on a normal day a Support Consultant would not spend more than four hours on the phone, [Filing No. 44-12 at 40];

24

- While working remotely during the COVID-19 pandemic, Support Consultants used Microsoft Teams to chat about customer issues, [Filing No. 44-12 at 25];

- Prior to August 2018, Ms. Mulryan would spend approximately three hours per shift on the phone with clients on average, [Filing No. 51-1 at 2];

- In 2017 and the first two months of 2018, Ms. Mulryan spent more than four hours on the phone with a customer approximately once every two months, [Filing No. 51-1 at 2]; and

- When a client had a complex issue, Ms. Mulryan would get the necessary information from them and call them back once she had figured out how to resolve the issue, [Filing No. 51-1 at 3].

The parties also present conflicting evidence regarding the effect of Ms. Mulryan's speaking restriction on other Support Consultants. RICS sets forth evidence that:

- By May 2018, Mr. Richburg was getting complaints from his team that the Support Consultants felt overworked, and that they were taking calls more frequently, [Filing No. 44-14 at 58-62];

- Without Ms. Mulryan being able to speak for her whole shift, the other Support Consultants were stating that they were spending more time on the phone without a chance for a break, and that there was a decrease in call quality, [Filing No. 44-14 at 61-62]; and

- Mr. Phillips thought that the lack of an additional Support consultant put additional pressure on every Support Consultant because they were down a person, and Mr. Rose thought that his job was made harder by having more work, [Filing No. 44-15 at 11].

On the other hand, Ms. Mulryan provides the following evidence:

- RICS had five Support Consultants working when Ms. Mulryan was on leave, but when she came back there were only five including her, [Filing No. 44-11 at 87-88; Filing No. 51-3]; and

- In August 2018, Ms. Mulryan completed 18.5% of the outstanding tickets, with Mr. Ford completing the most at 23.4%, and Mr. Forkner completing the least at 15.2%, [Filing No. 51-3].

Based on this conflicting evidence, the Court finds that there is a genuine issue of material fact regarding whether the ability to speak on the telephone or otherwise for a full eight-hour shift

was an essential function of the Support Consultant job.  Accordingly, the Court **DENIES** RICS's Motion for Summary Judgment to the extent it argues that Ms. Mulryan was not able to perform the essential functions of the Support Consultant job.

RICS raises additional arguments regarding Ms. Mulryan's claims, and the Court now considers those arguments in connection with each claim in turn, and assumes for purposes of its remaining discussion that Ms. Mulryan was able to perform the essential functions of her job as a Support Consultant.

### B.     ADA Discrimination

In support of its Motion for Summary Judgment, RICS argues that it was not required to accommodate Ms. Mulryan's inability to perform the essential job function of speaking for an entire shift by assigning her to different tasks.  [Filing No. 45 at 23.]  RICS asserts that Ms. Mulryan also cannot succeed on her ADA discrimination claim because there is no evidence that any decision was based on her disability, and that she cannot establish that any similarly situated employees were treated more favorably, that she was meeting RICS's legitimate employment expectations, or that RICS's reasons for terminating her were pretext for discrimination.  [Filing No. 45 at 27-32.]

In response, Ms. Mulryan asserts that "'[i]t is not disputable that [she] was fired because of her disability," and that "[b]ut for [her] restrictions which were the result of her disability, [she] would not have been terminated…."  [Filing No. 52 at 22.]

RICS replies that Ms. Mulryan has not provided any evidence that the decision to terminate her was discriminatory because Mr. Richburg and Mr. Brown "reasonably believed that [Ms.] Mulryan could not perform the essential functions of her job," and that she was terminated "as a consequence of her inability to perform the essential functions of her job."  [Filing No. 53 at 19.]

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A claim for disparate treatment under the ADA requires proof that: "(1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020) (citing *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019)). A plaintiff asserting a discrimination claim under the ADA may proceed under the approach outlined by the Seventh Circuit Court of Appeals in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), where the question is "'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that Ms. Mulryan was terminated due to her disability. *Castetter*, 953 F.3d at 996 (quoting *Ortiz*, 834 F.3d at 765). *Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'" 834 F.3d at 766. To show that discrimination was the "but for" cause of an adverse employment action, a plaintiff can point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trustees of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Additionally, the Seventh Circuit has not entirely done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). Under the *McDonnell Douglas* framework, a plaintiff must show that "(1) [she] is disabled under the ADA; (2) [she] was meeting [her] employer's legitimate employment expectations; (3) [she] suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601. "Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-discriminatory reason for its employment decision. If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.* (citation omitted). In order to show pretext, "[a] plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations and citations omitted). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.*

This case differs from the typical ADA disparate treatment case, where a plaintiff has been fired for a reason unrelated to their disability – *e.g.*, tardiness – and the defendant has not fired other, similarly situated employees who were also tardy, but who are not disabled. Here, Ms. Mulryan's termination directly relates to her disability because her disability – or, at the very least,

her restrictions related to her disability – was the reason RICS believed she could not perform an essential job function.  As the Seventh Circuit has explained:

> Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination.  This evidence need not be obvious to qualify as direct evidence.  Evidence of discriminatory motives must, however, have some relationship with the employment decision in question…  [O]ther evidence that reflect[s] a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality.  Proof of this nature supports the inference that a statutorily proscribed factor…was at  least a motivating factor in the adverse employment action at issue.

*Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997); *see also Coleman v. Keebler Co.*, 997 F. Supp. 1102, 1120 (N.D. Ind. 1998) ("[Defendant's] alleged statement to the Plaintiff that 'There is nothing here that you can do,' which came immediately after [Defendant] reviewed the Plaintiff's medical restrictions, coupled with….testimony that [Defendant] did not return the Plaintiff to work because of her physical restriction,…clearly constitutes direct evidence that [Defendant's] decision not to return the Plaintiff to the fry packer position was motivated by the Plaintiff's disability").

The focus on the criteria that the employer uses to make a decision leads to the conclusion that Ms. Mulryan's disparate treatment claim is intertwined with whether the ability to speak for an entire eight-hour shift was an essential job function.  If it was not an essential function, then the decision to terminate Ms. Mulryan was "based on an illegal employment criterion," and RICS's requirement that she be able to speak for an entire eight-hour shift would constitute evidence of discrimination.  Accordingly, because there is a genuine issue of material fact regarding whether being able to speak for an entire eight-hour shift is an essential job function, summary judgment on Ms. Mulryan's disparate treatment claim is not appropriate and RICS's motion is **DENIED** on that claim.

### C.       Failure to Accommodate Claim

In support of its Motion for Summary Judgment, RICS argues that it accommodated Ms. Mulryan's disability by providing her with over five months of extended leave, permitting her to have medical equipment at work, permitting her to have snacks at her desk to assist her in taking her medication, giving her flexibility to work around her doctor's appointments, and permitting her to try out an unspecified speaking restriction on a trial basis.  [Filing No. 45 at 25-26.]  RICS notes that the only accommodation it did not provide was to continue to accommodate the speaking restriction with a four-hour cap through November 17, 2018.  [Filing No. 45 at 26.]

In her response, Ms. Mulryan argues that there is a genuine issue of material fact regarding whether the ability to speak for an entire eight-hour shift is an essential function of the Support Consultant job.  [Filing No. 52 at 16-21.]

RICS reiterates its arguments in its reply.  [Filing No. 53 at 18.]

"A claim for failure to accommodate under the ADA…requires proof [that] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably."  *Scheidler*, 914 F.3d at 541 (emphasis omitted).  The third element – whether RICS reasonably accommodated Ms. Mulryan's disability – turns on whether being able to speak for an entire eight-hour shift is an essential function of the Support Consultant job.  If it was not, then a reasonable jury could conclude that RICS did not reasonably accommodate Ms. Mulryan.  As discussed above, there is a genuine issue of material fact regarding whether being able to speak for an entire eight-hour shift was an essential function of the Support Consultant job.  Consequently, there is a genuine issue of material fact regarding whether RICS reasonably accommodated Ms. Mulryan's disability, and the Court **DENIES** RICS's Motion for Summary Judgment on Ms. Mulryan's failure to accommodate claim.

### D.      Failure to Engage in the Interactive Process Claim

RICS argues in support of its Motion for Summary Judgment that a failure to engage in the interactive process is not an independent basis for liability under the ADA.  [Filing No. 45 at 27.] It contends that Ms. Mulryan must show that RICS's failure to engage in the interactive process resulted in a failure to identify an appropriate accommodation, and that RICS "provided every accommodation it was required to and more."  [Filing No. 45 at 27.]

In her response, Ms. Mulryan argues that "[t]here is also no question that RICS failed to engage in the interactive process when presented with [Ms. Mulryan's] new restrictions on September 11, 2018."  [Filing No. 52 at 21.]  It noted that "not even three…hours passed between [Ms.] Mulryan sharing the new restrictions at 3:20 p.m. and Mr. Brown's email terminating [her] at 5:46 p.m. all on September 11, 2018….   These facts support [Ms.] Mulryan's failure to accommodate claim."  [Filing No. 52 at 21.]

RICS does not address Ms. Mulryan's claim for failure to engage in the interactive process in its reply brief.  [*See* Filing No. 53.]

"After an employee has disclosed that she has a disability, the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal quotation and citation omitted).  The failure to engage in this process "alone is not an independent basis for liability," though it is "actionable if it prevents identification of an appropriate accommodation for a qualified individual." *Id.* at 1062 (internal quotation omitted). An employee's request for an accommodation requires the employer to "engage in a 'flexible, interactive process that involves both the employer and the [employee] with a disability.'" *Golden*

*v. Indianapolis Housing Agency*, 2017 WL 283481, at *8 (S.D. Ind. 2017) (citing 29 C.F.R. §

1630; *Felix v. Wis. Dep't of Transp.*, 104 F. Supp. 3d 945, 956 (E.D. Wis. 2015)).

While it is true that Ms. Mulryan's failure to engage in the interactive process claim can

only provide an independent basis for liability if there was a reasonable accommodation that RICS

could have provided, this again turns on whether being able to speak for an entire eight-hour shift

was an essential function of the Support Consultant position.  The Court has already found that

there is a genuine issue of material fact regarding whether Ms. Mulryan can make the threshold

showing that she was able to perform the essential functions of the job.  Accordingly, the Court

**DENIES** RICS's Motion for Summary Judgment on Ms. Mulryan's failure to engage in the

interactive process claim.

### E.    ADA Retaliation Claim

Ms. Mulryan alleges in her Complaint that RICS "retaliated against [her] for continuing to

need accommodation of her disability."  [Filing No. 1 at 4.]  Ms. Mulryan also set forth an ADA

retaliation claim in her Statement of Claims.  [Filing No. 39 at 1 (listing "retaliatory discharge due

to disability discrimination pursuant to [the ADA]" as one of her claims).]  Although RICS requests

in its Motion for Summary Judgment that the Court "enter judgment in favor of RICS and against

[Ms.] Mulryan on all claims," [Filing No. 44 at 1], it does not address her claim for retaliatory

discharge in its briefs in support of its Motion for Summary Judgment, [*see* Filing No. 45; Filing

No. 53].  Accordingly, to the extent that RICS seeks summary judgment on Ms. Mulryan's

retaliatory discharge claim, its Motion for Summary Judgment is **DENIED**.

## IV.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** RICS's Motion for Summary Judgment. [44.] The Court requests that the Magistrate Judge meet and confer with the parties as soon as practicable regarding the possibility of resolving Ms. Mulryan's remaining claims short of trial.

Date: 5/26/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**